## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 07 B 2791 |
| BRUCE WERNER, | ) | |
| | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| HARRIS BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. No. 07 A 390 |
| v. | ) | |
| | ) | |
| BRUCE A. WERNER, Individually and as Trustee | ) | |
| of the Bruce A. Werner Trust dated January 1, | ) | |
| 2000, and BETH R. WERNER, Individually and as | ) | |
| Trustee of the Beth R. Werner Trust dated January | ) | Judge Pamela S. Hollis |
| 1, 2000, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION

This matter comes before the court following trial on the complaint brought by
Harris Bank, N.A. On January 23, 2002, Bruce A. Werner ("Werner") transferred his
residence at 22460 South 88th Avenue, Frankfort, Illinois (the "Real Property") into
tenancy by the entirety. Harris Bank seeks to avoid that transfer in order to collect on a
judgment obtained in state court. Having heard the testimony of witnesses, reviewed the
exhibits submitted into evidence and read the papers filed by the parties, the court finds in
favor of the defendants. Werner's transfer of the Real Property into tenancy by the
entirety will not be avoided.

## FINDINGS OF FACT

Fifty-six year old Bruce Werner has been farming in Frankfort for approximately twenty years. He currently works for an electrical contractor because "[f]arming is my passion. I've never made a living doing it. You know, farming is a disease. A[nd] it's probably a good thing that it is because nobody would do it otherwise." Tr. at 70.[1]

Werner has also owned gas stations, working as a Shell Oil dealer for approximately thirty years. He is now out of that business, having sold his Shell Food Mart and car wash on January 3, 2001, in a deal that netted him approximately $400,000. Tr. at 71. He also owned a book store named Practical Magick, beginning in 1998 or 1999. Tr. at 106. Werner employed a manager to run the store. Tr. at 80.

Several years ago, the Werners' accountant James Mommsen suggested that they transfer ownership of their real property into trusts. Tr. at 13-14. At the time, the Werners owned the Real Property, a ten acre piece of real estate (the "Farm Property"), a home in Orland Hills and a condominium in Tinley Park. Tr. at 72.

Werner believed that the goal of the trust formation and of transferring the real estate into the trusts was to be "able to create an estate plan of some sort and be able to move properties in and out of that trust." Tr. at 14. Although he recommended creating the trusts, Mommsen never read the trust instruments. Tr. at 166.

On or about January 1, 2000, Werner signed a Declaration of Trust for the Bruce A. Werner Trust, making him Trustee of the Bruce A. Werner Trust. Creditor's Ex. 1. On the same date, his wife Beth Werner signed a Declaration of Trust for the Beth R. Werner Trust, making her Trustee of the Beth R. Werner Trust. Creditor's Ex. 2. Their

---

[1] All references to "Tr. at ___" are to the testimony given at trial on September 18, 2008.

attorney, James Friel, prepared the trust instruments for both the Bruce Werner Trust and the Beth Werner Trust. Tr. at 12.

All of the real estate that the Werners owned – the Real Property, the Farm Property, the Orland Hills home and the Tinley Park condominium – were transferred into the trusts on February 14, 2000. Tr. at 73; Creditor's Ex. 3.

Several months later, in mid to late November 2000, Werner first met Thomas Planera and Joseph Zarlengo, who were law partners, in a meeting set up by a mutual friend, Brett Rizzi. Tr. at 44, 189-190. Rizzi organized the meeting in order to introduce prospective investors in a business venture. Tr. at 190. According to Werner, "this was a meet and greet, basically. I had never met Tom and Joe. He wanted us to be his partners, and it was to meet, you know, the potential partners in the deal." Tr. at 74. The four eventually formed an LLC and purchased a self-storage facility in Joliet, Illinois. Tr. at 190-191. Zarlengo believed that the property in Joliet "was worth probably about a million dollars." Tr. at 192.

Werner learned at the initial meeting that Zarlengo was a tax attorney who specialized in estate planning and IRS resolution work. Tr. at 193. Werner told Zarlengo about the trusts and his estate plan, and asked if his plan differed from those that Zarlengo set up for his clients. Tr. at 194. Zarlengo never reviewed the Werners' trust instruments. Tr. at 199.

Werner testified that having asked Zarlengo about his estate plan, "[t]he only thing he didn't like about it was he believed that -- and he recommended to his clients that a husband and a wife should hold their house in tenancy by the entirety." Tr. at 45. Zarlengo confirmed that

> [k]ind of a pet peeve of mine is I just hate to see homes, personal
> residences, in trusts. And I mentioned that.
>
> . . . . I just don't like properties in trust primarily because when one
> spouse dies, then half the house is owned by a trust, and usually the trust
> will have children as beneficiaries. So essentially you're answerable to
> your kids about what you want to do with half the house.

Tr. at 194. Zarlengo also testified that while nearly all of the benefits of tenancy by the

entirety could be achieved with joint tenancy with right of survivorship, joint tenancy

allowed one spouse to encumber the house without the approval of the other spouse. Tr.

at 208-210.

Zarlengo told Werner that he could shield the Real Property from creditors by

transferring it into a tenancy by the entireties estate. Tr. at 45-46. Indeed, Werner

recalled Zarlengo describing numerous benefits of holding a homestead in tenancy by the

entirety:

> [T]he benefits to that were that you would have 100 percent ownership of
> that. You had control [of] 100 percent as opposed to the half interest that
> you had before. And then there was a survivorship benefit. And by that, I
> took it to mean that in the event of a death, it made it easier, there was less
> paperwork, less red tape for the surviving spouse to inher[i]t the home
> because they already owned 100 percent of it. There was a tax benefit to
> doing so as well. It created protection, although – you know, my wife had
> no creditors, and I didn't at the time either. I had potential liabilities from
> businesses. He said it would protect Beth's, you know, interest in the
> house against my liabilities should -- potential liabilities should they ever
> arise."

Tr. at 75.

At the time, Werner did not have any actual liabilities. He had cash in the bank,

investments, and regular income from a job. Tr. at 78-79. He paid his bills as they came

due, and carried no credit card debt. Tr. at 79. Nevertheless, Werner was mindful of the

potential liabilities that might arise as a result of the operation of his businesses. Tr. at

80.

While Werner and Zarlengo had no further conversations about owning property in tenancy by the entirety, Tr. at 50, Werner called Mommsen shortly afterward. Werner trusted Mommsen, who had been his accountant for over thirty years, Tr. at 81-82, and asked Mommsen to verify what Zarlengo had told him about tenancy by the entirety. Tr. at 53-55.

Mommsen returned the call on December 12, 2000, and confirmed that transferring the Real Property into tenancy by the entirety would protect it from liabilities incurred solely by one spouse. Tr. at 82, 159-166.

As Mommsen discussed with Werner at a later date, Werner had a number of potential liabilities that made him a good candidate for holding his residence in tenancy by the entirety:

> Well, he had the gas stations, so he had -- he had employees. Whenever you have employees, you have -- you've got liability problems. He had the gas station and all the obvious hazards with that. The retail store he had, I believe, I believe [sic], that he also had a personal guarantee on a lease there, so he had potential there. And the lease was getting a little bit behind. He had the snowplowing as – all the other things that were brought up before. But snowplowing, I wasn't worried about the snowplowing myself. I was worried about the corporate – the work, the potential for liability from the businesses, whether he made a bad deal or whatever he did, or signed a potentially bad contract.

Tr. at 175. Mommsen clearly remembered this conversation, which took place on March 19, 2002, because he happened to have kept the dated telephone message. "I have a stack of old messages that I've kept as references, and that's one. That's why it's all discolored, it was sitting in the sun underneath the phone." Tr. at 174.

Werner also testified as to the potential liabilities from his various activities. He plowed snow at his business location and his employer's driveway, Tr. at 144, and was concerned about "hauling a thousand-pound snowplow out in front of an 8,000 pound

truck . . .". Tr. at 80. He drove farm machinery on public roads. Tr. at 59-60. "A very good friend of mine killed a man moving a combine down the road." Tr. at 80.

Following Mommsen's confirmation of the benefits of tenancy by the entirety, and Mommsen's recommendation that it was a good idea, Werner decided to "call Mr. Friel [his attorney] and have that done right away." Tr. at 82-83.

Werner tried to contact Friel in December 2000, Tr. at 51, but learned that Friel was on vacation until the first of the year. Mommsen testified that many of his clients have trouble contacting Friel "because the man is semiretired, and he's very difficult to get ahold of." Tr. at 170.

Meanwhile, after the meeting with Rizzi, Zarlengo and Planera, Werner acquired membership interests in the LLCs that owned and operated storage facilities. Eventually four LLCs were formed, each operating one storage facility. Werner owned a 25% interest in each of the four LLCs. Tr. at 88-89; Creditor's Exs. 4-8.

Werner guaranteed the loans Harris Bank extended to the LLCs. He understood that by doing so he was responsible for any liability that might remain after payments were made and other collateral was liquidated. Tr. at 119 ("I didn't consciously think that, but I'm sure that's the case."). In addition to the guarantee, Werner also caused a mortgage to be placed on the Farm Property in favor of Harris Bank as collateral for the loans. Tr. at 109.

Although Werner had learned about tenancy by the entirety in late 2000, and confirmed its benefits with Mommsen, for months he did nothing further than make one unreturned phone call to Friel. He forgot to call Friel back in January 2001, after Friel

returned from vacation. "When I couldn't get through to Mr. Friel initially . . . then

January came, I sold the Shell station." Tr. at 107. Shortly after selling the Shell station,

> we got into all of these storage facilities with Brett and Harris Bank. I had
> two daughters getting married in that time frame. I had a son go away to
> college in that time frame. I had a farming operation that – basically,
> when you work full-time and you farm, you work 18, 20 hours a day
> during the spring planting and fall harvest. It was always one thing after
> another that allowed me to procrastinate, and I do regret that. And,
> finally, it just right – you know, my second daughter got married in
> August of '02. My wife and I discussed it again shortly after that because
> things in our life seemed to have settled down enough. And so then,
> finally, right after the harvest of that year is when I initiated the contact
> again with Mr. Friel's office.

Tr. at 107-108.

Werner finally discussed with his wife Beth the possibility of transferring the Real

Property into tenancy by the entirety in August 2002, shortly after their second daughter

was married on August 10. Tr. at 134. Beth Werner never spoke directly to Zarlengo,

Mommsen or Friel about the benefits of holding property in tenancy by the entirety rather

than in trust. Tr. at 133. Indeed, the only time she met Friel was when she went to his

office to sign the deed. Tr. at 136; Creditor's Ex. 16.

Beth Werner's understanding was that if the Real Property were held in tenancy

by the entirety, she would own

> the property 100 percent, and that then in that case things would be easier
> for me if it were – you know, if he were to pass away or something. And I
> believe there were tax credits or something, too, but I don't remember if
> he explained what kind of tax credits. I don't believe he did.
>
> Q:    You mean tax credits or tax benefits?
>
> A:    Tax advantages or some sort of thing.

Tr. at 143-144.

Beth Werner could not say whether these protections were different than those available under the trusts. "Well, I don't really understand the trusts." Tr. at 145. Werner had explained to her that owning the property in tenancy by the entirety "would be easier for him and myself in case of death, and that it protected us from any kind of other liabilities that he may incur or that I may incur in the business that he owned, the other businesses." Tr. at 151.

In fact, the only new liability that Werner incurred between 2000 and 2003 was his guarantee to Harris Bank. Tr. at 124.

On July 15, 2002, the president of Harris Bank, Frankfort, wrote to Werner to advise him that the Bank had debited $14,641.02 from two certificates of deposit that Werner had pledged. Tr. at 18; Creditor's Ex. 9. The debits were applied to the amounts that were due on May 26 and June 26, 2002, on the loan made in connection with the Joliet storage facility. Creditor's Ex. 9. Beth Werner was aware that the CDs had been debited because she overheard her husband on the telephone. Tr. at 146.

The bank president wrote again on August 1, 2002, informing Werner that the July 26, 2002 payment had also been missed. Creditor's Ex. 10; Tr. at 19-20.

> [Y]ou are now considered in default based on your failure to make the scheduled monthly payment. Payment is expected within (three) business days of the date of this notice.
>
> Failure to do so will result in this bank taking whatever action it deems necessary to quickly collect payment, including all legal expenses.
>
> Creditor's Ex. 10.

On September 17, 2002, Werner filed a state court complaint against Rizzi, Harris Bank Frankfort and certain other defendants. Creditor's Ex. 11. Shortly thereafter,

Werner filed a motion seeking entry of a temporary restraining order and a preliminary injunction. Creditor's Ex. 12.

Most of Werner's state court complaint alleged fraud by Rizzi. However, Werner also sought to enjoin Harris Bank from bringing any action on the guarantees he had executed. Creditor's Ex. 11; Tr. at 21. According to the TRO motion, Werner wanted to prevent Rizzi and Harris Bank from "[t]aking any action on personal guarantees or assignments of collateral signed by Werner until his claims for fraud, securities fraud, breach of fiduciary duty, misrepresentation and rescission may be determined." Creditor's Ex. 12.

In the meantime, Werner tried to contact Friel again, in late November or December 2002. Tr. at 51-52. Although Friel was on another extended vacation, this time Werner remembered to call him back after the first of the year. Tr. at 84.

On January 10, 2003, Cook County Judge Julia Nowicki denied Werner's requests for a temporary restraining order and for a preliminary injunction, on the grounds that he failed to show irreparable injury. Creditor's Ex. 15. Harris was free to sue Werner on his personal guarantees.

On January 23, 2003, Werner and Beth Werner transferred the Real Property from the trusts in which it had been held for three years into tenancy by the entirety. Tr. at 27; Creditor's Ex. 16. Werner estimated the value of the residence at that time to be approximately $500,000, and he owned it free and clear. Tr. at 34-35. Indeed, Werner had "no [actual] liabilities and . . . no creditors." Tr. at 60.

At the time he made the transfer, Werner "had recently filed legal action against Harris Bank, and on that day you could never have convinced me that I could possibly

lose." Tr. at 91. The 21 page brief filed in support of Werner's motion for preliminary injunction argued that Werner was entitled to a declaratory judgment that his guarantees were discharged by virtue of Harris Bank's continual and material misrepresentations. Creditor's Ex. 13.

Werner believed that he could pay any debt owed to Harris Bank because "I had a net worth that was worth more than that net debt." Tr. at 91. Werner calculated his net worth in January 2003 to be between $1.1 and $1.4 million. Tr. at 91-92.

- The Real Property - $500,000
- The Farm Property - $200,000
- Practical Magick - $270,000 (A "New Age book store, a shop," sold in August 2004 to his manager for no consideration. By 2007, the business had closed. Tr. at 106; 122-123.)
- Shares of Practical Magick - $100,000
- Cash and personal property - $100,000

Tr. at 93-95. Werner also owned a 25% membership interest in the four LLCs and he believed his stake was worth "[a] couple hundred thousand, maybe." Tr. at 93.

On January 27, 2003, Harris Bank attorney David Audley sent a letter to Werner's attorney and to two other attorneys, advising them that the following amounts remained due on the LLC loans:

| | |
|---|---|
| Joliet Term Loan: | $859,732.07 |
| Joliet Revolving Loan: | $227,422.49 |
| Rockford Loan: | $573,254.91 |
| Michiana Loan: | $990,152.03 |

Camp Verde Loan:              $154,919.21

Stip. Ex. A. The total amount due to Harris Bank on the LLC loans was $2,805,453.71.
Werner could not have written a check for that amount on that date, four days after he
transferred the Real Property into tenancy by the entirety. Tr. at 66.

Although he could not have written a check on that date for the full amount owed
to Harris Bank, Werner believed that the value of the facilities owned by the LLCs
exceeded the amount due. "I can only assume that we – what we owed was less than the
value of those facilities because Harris Bank made that – made these loans." Tr. at 92.

Audley also indicated in his January 27 letter that $165,334.24 in legal fees and
costs incurred by Harris Bank had been paid by debiting that amount from a certificate of
deposit Werner had posted, and that the remainder of the certificate of deposit was
applied to the Joliet Term Loan. Two certificates of deposit posted by Rizzi as well as
another posted by Werner were applied to the balance due on the Camp Verde loan, and
another Rizzi certificate of deposit was applied to the balance due on the Rockford Loan.
Tr. at 90-91; Stip. Ex. A.

The January 27 letter did not contain a demand for payment on Werner's
guarantee. Stip. Ex. A.

Harris Bank eventually foreclosed on the storage facilities owned by the four
LLCs. At the sale of each property, Harris credit bid the following amounts:

| Location | Credit Bid | Amount of note | Sale Date |
|----------|-----------|----------------|-----------|
| Joliet | $450,000.00 | $900,000.00 | March 26, 2003 |
| Rockford | $425,000.00 | $675,000.00 | February 27, 2003 |
| Michiana | $775,000.00 | $975,000.00 | March 18, 2003 |

| Camp Verde | none | $400,000.00 | N/A |

Tr. at 128-129. The Camp Verde property was turned over to the first lienholder, with no recovery to Harris Bank. Tr. at 112-113.

On June 6, 2003, Harris Bank sent a letter to Werner's attorney and the same two other attorneys, advising them of the results of the various foreclosure sales. The subject line of the letter was "Demand on Guaranty Liability." This letter was Harris Bank's first demand for payment on Werner's guarantee. Ex. 10 to Creditor's Ex. 17.

When no payment was made, Harris Bank sued Werner on his guarantee, requesting judgment in the amount of $1,296,479.27. Tr. at 37-38; Creditor's Ex. 17. Werner could not have written a check for that amount on the date the complaint was filed. Tr. at 42, 116. Harris sued the other LLC members as well, each of whom allegedly executed personal guarantees. Creditor's Ex. 17.[2]

On February 16, 2006, a judgment was entered against Werner in state court in favor of Harris Bank in the amount of $840,122.37. Creditor's Ex. 18. Of that amount, $310,479.76 was attributable to attorneys' fees. Stip. Ex. B.

Werner filed for relief under Chapter 11 of the Bankruptcy Code on February 19, 2007. When Werner filed his bankruptcy petition, he valued the Real Property at $575,000. Creditor's Ex. 20 at Schedule A. There is now a mortgage on the residence, securing a line of credit of approximately $275,000, extended in 2003. Tr. at 107.

---

[2] Harris Bank's state court complaint alleged that Rizzi, Planera and Zarlengo executed guarantees for certain (Rizzi) or all (Planera and Zarlengo) of the LLC notes. Creditor's Ex. 17. Allegations in a complaint are not evidence. However, Zarlengo testified that he, Planera and Werner all guaranteed the $900,000 note to the Joliet facility. Tr. at 192. Zarlengo also testified that he and Werner guaranteed an additional $225,000 note on that same property. Tr. at 201-202.

Planera and Zarlengo eventually filed their own bankruptcy cases as well, discharging any personal liability to Harris. Tr. at 203-204.

Harris Bank filed the instant proceeding on May 9, 2007, seeking to avoid the transfer of the Real Property into tenancy by the entirety. Following resolution of a motion to dismiss and a motion for summary judgment, a trial was held on September 18, 2008. Plaintiff and defendants each filed two post-trial briefs, and the court took the matter under advisement on January 8, 2009.

## CONCLUSIONS OF LAW

There are several different ways in which a person may hold title to real property. Each method brings different sticks to that owner's bundle of rights. Three methods of concurrent ownership come to us from English common law: tenancy in common, joint tenancy and tenancy by the entirety. U.S. v. Craft, 535 U.S. 274, 279 (2002).

> A tenancy by the entirety is a unique sort of concurrent ownership that can only exist between married persons. . . .
>
> Like joint tenants, tenants by the entirety enjoy the right of survivorship. Also like a joint tenancy, unilateral alienation of a spouse's interest in entireties property is typically not possible without severance. Unlike joint tenancies, however, tenancies by the entirety cannot easily be severed unilaterally. Typically, severance requires the consent of both spouses, or the ending of the marriage in divorce.

Id. at 280-281 (citations omitted).

Thus, tenancy by the entirety is a method of owning real property available only to a husband and wife. In Illinois, a tenancy by the entirety estate is created when the instrument of conveyance expressly declares that the transfer is made to tenants by the entirety. 765 ILCS 1005/1c. This form of ownership can only be used by the husband and wife for their homestead property. Id.

After meeting these requirements, a transfer into tenancy by the entirety receives special protection in Illinois. According to 735 ILCS 5/12-112 (emphasis added),

> Any real property, or any beneficial interest in a land trust, held in tenancy by the entirety shall not be liable to be sold upon judgment entered on or after October 1, 1990 against only one of the tenants, **except if the property was transferred into tenancy by the entirety with the sole intent to avoid the payment of debts existing at the time of the transfer beyond the transferor's ability to pay those debts as they become due**.

It is the standard elucidated in this statute, rather than in the state or federal fraudulent transfer statutes, that determines whether a transfer of property into tenancy by the entirety may be avoided. See Harris Bank St. Charles v. Weber, 700 N.E. 2nd 722, 728-729 (Ill. App. Ct. 1998). As the Illinois Supreme Court has described it:

> The sole intent standard provides greater protection from creditors for transfers of property to tenancy by the entirety. Under the sole intent standard, if property is transferred to tenancy by the entirety to place it beyond the reach of the creditors of one spouse *and* to accomplish some other legitimate purpose, the transfer is not avoidable. Such a transfer, however, would be avoidable under the actual intent standard, which only requires any actual intent to defraud a creditor. The General Assembly, by adopting the sole intent standard, has made it clear that it intends to provide spouses holding homestead property in tenancy by the entirety with greater protection from the creditors of one spouse than that provided by the Fraudulent Transfer Act.

Premier Property Management, Inc. v. Chavez, 728 N.E. 2nd 476, 482 (Ill. 2000) (emphasis in original).

In the instant proceeding, Harris Bank asks the court to avoid Werner's transfer of the Real Property from the trusts into tenancy by the entirety on January 23, 2003. In order to determine whether Harris Bank will prevail, 735 ILCS 5/12-112 instructs us to resolve two questions:

1. Was Werner unable to pay existing debts as they became due?
2. Did Werner transfer the Real Property with the sole intent of avoiding payment of those debts?

If both of these questions are answered in the affirmative, Harris Bank will prevail and the transfer will be avoided. If the answer to either or both of these questions is "no," then judgment must be entered for the defendants.

### The Transfer of the Real Property Into Tenancy By the Entirety Did Not Leave Werner Unable to Pay Existing Debts as They Became Due.

In his post-trial brief, Werner argued that to answer the question of whether he was unable to pay existing debts as they became due, the court must determine whether he "was solvent and had the financial ability to pay his debts as they became due at the time of the Transfer." But solvency is a balance sheet question, requiring the court to determine whether "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation. . .". 11 U.S.C. § 101(32). The statute applicable in this proceeding, 735 ILCS 5/12-112, makes no mention of solvency.

Harris rejected Werner's solvency theory, and asserted that "[t]he proper inquiry is whether Debtor had sufficient cash flow to pay his debts in accordance with his obligations." In support of its argument, Harris cites articles that describe the "ability-to-pay solvency test." J.B. Heaton, Solvency Tests, 62 Bus. Lawyer 983, 988-989 (May 2007); Dan Williams, Fraudulent Transfer – What Do the Numbers Say?, 15 Am. Bankr. Inst. J. 15 (March 1996).

These articles consider the Uniform Fraudulent Transfer Act and state fraudulent transfer statutes, which ask whether a debtor "intended to incur, or believed that [it] would incur, debts that would be beyond [its] ability to pay as such debts matured." Neither of the articles consider a transfer made under 735 ILCS 5/12-112, which asks a slightly different question – whether the property was transferred with the intent to avoid existing debts as they became due.

Moreover, the examples in these articles focus only on companies rather than on individuals, requiring analysis of "cash flow from operations" and asking "whether the firm will be able to match its cash sources to its maturing obligations." Id. Such questions have no place in the analysis of a transfer into tenancy by the entirety, which by necessity can only be accomplished by a husband and wife, and applies only to their homestead. Indeed, the parties do not cite even one case that engaged in any significant analysis of the phrase, "beyond the transferor's ability to pay those debts as they become due."

The court will therefore first determine what debts Werner had, and then determine whether he had the ability to pay those debts, not just from income, but also from liquidation of his assets.

The parties do not dispute that the only relevant "existing debt" is Werner's guarantee liability. That debt had not yet become due. While Werner was on notice that the LLCs had defaulted, and that certificates of deposit he had posted as collateral were being debited, there had not been a demand on the guarantee at the time of the transfer. That demand did not come until June 6, 2003, more than four months after the Real Property was transferred into tenancy by the entirety.

The court must therefore determine the value of the guarantee on the date of the transfer, January 23, 2003. Although no demand had been made yet, the guarantee cannot be valued at zero. It was a contingent liability, valued somewhere between zero and $2,805,453.71, the total amount due to Harris Bank according to the bank's January 27, 2003 letter.

In order to calculate the value of the guarantee, the court will use the

methodology set forth in Matter of Xonics Photochemical, Inc., 841 F. 2nd 198 (7th Cir.

1988):

> There is a compelling reason not to value contingent liabilities on the balance sheet at their face amounts, even if that would be possible to do because the liability, despite being contingent, is for a specified amount (that is, even if there is no uncertainty about what the firm will owe *if* the contingency materializes). By definition, a contingent liability is not certain-and often is highly unlikely-ever to become an actual liability. **To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real**.

841 F. 2nd at 200 (emphasis added). "Discounting a contingent liability by the probability

of its occurrence is good economics and therefore good law." Covey v. Commercial

Nat'l Bank of Peoria, 960 F. 2nd 657, 660 (7th Cir. 1992).

Xonics and Covey were decided in the context of a calculating solvency.

Nevertheless, in order to determine whether Werner had the ability to pay this guarantee,

the court must calculate the value of that guarantee, and the Seventh Circuit has provided

the mechanism for doing so. The value of the guarantee on the date of the transfer is the

full amount of the debt, discounted by the likelihood -- at the time of the transfer -- that

the liability represented by the guarantee would become real.

In order to calculate that likelihood, Werner urges the court to first calculate the

value of the other assets pledged to secure the debt to Harris. Harris asserts that Werner's

analysis begs the question of whether Harris would first liquidate other assets before

moving to collect from Werner. "Debtor's reliance on the collateral to reduce the amount

is misplaced since the terms of the guarantees provide that Debtor was unconditionally

liable for the full amount owed under the LLC loans, without resort to the potential

liquidation of remaining collateral."

The court rejects Harris's assertion. It is disingenuous to ignore the other collateral securing the note. Certainly, under the terms of the guarantee, Werner was liable for the entire obligation. But on January 23, 2003, what was the probability that Harris would be unable or unwilling to collect anything on all other available assets and would instead attempt to collect the entire amount from Werner?

That probability, multiplied by the amount of the entire obligation, provides the court with the discounted value of Werner's guarantee. Then we can determine whether the value of the guarantee was beyond Werner's ability to pay after the transfer. See In re McCook Metals, LLC, 2007 WL 4287507, *1 (N.D. Ill. Dec. 4, 2007) (including 100% of an obligation was "improper without a basis for concluding that there was a 100% certainty that McCook would default on its obligations or that the entire default would fall on Longview's shoulders"). The Seventh Circuit was even more explicit than the district judge in rejecting the McCook Metals expert's valuation of contingent obligations, finding that his treatment of "contingent liabilities as certainties. . . invalidated his expert opinion." Baldi v. Samuel Son & Co., Ltd., 548 F. 2nd 579, 582 (7th Cir. 2008). The expert should have made an "effort to discount the risk by the probability that it would materialize." Id. at 583.

Indeed, Harris did pursue other collateral. It did not make a demand on Werner's guarantee until June 6, 2003. By the time Harris actually sued Werner in state court in July 2003, nearly six months after the Real Property's transfer into tenancy by the entirety, the bank sought only the $1,296,479.27 that remained after all of the other collateral had been liquidated, plus attorneys' fees.

The other pledged assets were the parcels of real estate owned by the LLCs, the certificates of deposits pledged by Werner and the other members of the LLCs, and the personal guarantees of certain other members. Werner testified that on the date of the transfer, he believed that the value of the facilities owned by the LLCs alone exceeded the $3,200,000 owed to Harris Bank.

As rebuttal evidence, Harris submitted the value actually recovered at the foreclosure sales from the parcels of real property, $1,650,000. The court has no evidence from Harris Bank or Werner regarding the value of the other collateral securing the obligations – Rizzi's trusts, and any personal guarantees from Zarlengo and Planera.

Although the sale of the real estate only paid down slightly more than half of the outstanding balance, there was other collateral remaining, collateral about which the court has no information. Additionally, Werner testified that he had assets valued at approximately $670,000, not including the Real Property or his equity interests in the LLCs.

Moreover, determining the value of the collateral other than Werner's guarantee is only part of the required analysis. The court must also determine the probability on January 23, 2003, that Harris Bank would succeed in its attempt to call in Werner's guarantee.

Werner believed that he had a solid case against Harris Bank, telling the court that on the date of the transfer "you could never have convinced me that I could possibly lose." Although he lost the motion for a temporary restraining order, it was only on the basis of failure to prove irreparable injury. The possibility remained – as the case was litigated for three more years – that Werner would prevail.

Finally, although the LLCs were in default, Werner's guarantee was not yet due on the date of the transfer into tenancy by the entirety. Harris Bank had not yet demanded payment on that guarantee, and did not do so for more than four months.

There is a combination of factors to consider: the value of the other collateral securing the loans, Werner's assets other than the Real Property, the fact that the guarantee had not yet ripened into a liquidated debt and the legal question about whether the guarantee was valid. Without the assistance of expert testimony, the court cannot calculate a specific figure at which to value the guarantee on the date of the transfer.

It was Harris Bank's burden to prove that Werner could not pay the guarantee on the date of the transfer. Harris did not call an expert to value the guarantee, but argued instead that unless Werner could pay the entire amount of the outstanding debt, the court must find that the transfer left him unable to pay existing debts as they came due.

The court rejects this analysis. Having reviewed the evidence submitted, and being mindful of the Circuit's admonition to discount this contingent liability by the probability of its occurrence, the court cannot find by a preponderance of the evidence that the transfer of the Real Property into tenancy by the entirety left Werner without the ability to pay existing debts as they became due.

## Werner Did Not Transfer the Real Property With the Sole Intent of Avoiding Payment of the Guarantee.

Because the court found that the transfer did not leave Werner unable to pay existing debts as they became due, the court need not consider the second question in the analysis, whether Werner transferred the Real Property with the sole intent of avoiding payment on the guarantee. Nevertheless, since the answer to this second question

supports the result reached in the first part of this discussion, the court will continue its analysis.

The question of a debtor's intent at the time of the transfer is a question that must be resolved by the trier of fact. <u>Harris Bank St. Charles</u>, 700 N.E. 2nd at 729. A review of the pertinent facts is therefore appropriate.

In late 2000, Zarlengo told Werner that he could protect his residence from creditors to whom he was solely liable by holding the property in a form of ownership known as tenancy by the entirety. Within the next few weeks, Werner contacted his trusted accountant to confirm this information, and then called his attorney to make arrangements for a change in ownership status.

Werner's attorney was out of town, and for the next two years, Werner did nothing to move the property from ownership in a trust into tenancy by the entirety. Werner urges the court to consider all the events occurring in life during those two years – the marriages of two daughters, the sale of the Shell station, his son leaving for college.

Harris Bank reads the facts differently, focusing instead on Werner's actions when, in the summer of 2002, he learned that the LLC loans were in default and that the bank had drawn down on the certificate of deposit he pledged. In September 2002, Werner filed a lawsuit against Harris Bank, seeking to enjoin it from proceeding against him on its guarantees, and he filed a motion for temporary restraining order and a preliminary injunction. Two weeks after that motion was denied, Werner finally moved the property into tenancy by the entirety.

Harris Bank compares the facts in this case to those in <u>LaSalle Bank N.A. v. DeCarlo</u>, 783 N.E. 2nd 211 (Ill. App. Ct. 2003). The <u>DeCarlo</u> defendant argued that "he

made the transfer because he was advised to do so by a family attorney," who had suggested it to him more than a year earlier. Id. at 216. He had delayed effecting the transfer "because he was preoccupied by an illness and a death in the family." Id. at 213. The trial court found these reasons "vague, inarticulate, specious and totally incredible," id., especially as the transfer was made within days after the appellate court affirmed a judgment against him.

This court did not hear the testimony given in DeCarlo. But Werner's testimony was forthright and credible. The DeCarlo debtor accomplished his transfer 17 days after a state court judgment was affirmed by the appellate court; Werner had not even had a demand for payment made when he transferred the Real Property. The DeCarlo debtor had $200,000 in equity in his residence and less than $4,000 in other assets. The amount of Werner's equity in his residence, while large, was less than half of his net worth at the time of the transfer. The facts in DeCarlo are significantly different from those before the court today.

It is true that if the court were to consider only the timing of the transfer, Werner's intent is suspicious:

January 10, 2003:     Werner loses TRO motion

January 23, 2003:     Werner transfers the Real Property into tenancy by the entirety

But if the court were to consider just those two facts, it gives short shrift to the entire context of this transfer. Werner did not make this decision in a vacuum that consisted only of his liability to Harris Bank and his ownership of the Real Property.

Indeed, timing is not the only factor that can or should be considered by a court in determining a debtor's intent:

> Debtor . . . testified that the purpose of moving to the Lorel Property was
> because it was a much safer neighborhood with less gang activity. . . .
>
> Aetna offered no evidence to refute Debtor's contention. Therefore, **while
> the timing of Debtor's actions may appear suspicious, Aetna has not
> satisfied its burden** in proving by a preponderance of the evidence that
> Debtor's purchase of the Lorel Property was done with the 'sole intent' to
> avoid the payment of the debt owned to Aetna.

In re Moreno, 352 B.R. 455, 461 (Bankr. N.D. Ill. 2006) (emphasis added).

Similarly, Werner testified about his understanding of the benefits of tenancy by
the entirety. While Harris Bank questioned Werner, his wife, Zarlengo and Mommsen
about the terms of Werner's trusts and whether those trusts actually provided many of the
same survivorship and tax benefits that tenancy by the entirety would provide, there was
no direct testimony about the content of the trusts. No one who testified had actually
read the trust instruments.

Although the trusts were admitted as exhibits, Harris Bank did not call a witness
who could confirm that the terms of the trust in which Werner and his wife held their real
property provided the same protections as tenancy by the entirety, with the exception of
protecting the Real Property from the debts of one spouse.

Additionally, under Harris Bank's questioning, Zarlengo admitted that joint
tenancy with right of survivorship could have conferred the same tax benefits as tenancy
by the entirety. But Zarlengo was not acting as Werner's attorney when they met in late
2000. There was no testimony that Zarlengo and Werner discussed options for ownership
of a homestead other than tenancy by the entirety. Unsurprisingly, a casual conversation
held during a meeting to discuss an unrelated matter may not have produced the best
legal advice for the situation.

Based on his testimony, it appears that Bruce Werner did not have a complete understanding of what the trusts could accomplish, or whether tenancy by the entirety was his only option for protecting his homestead. An attorney with whom he was about to do a business deal told him that he should hold his residence in tenancy by the entirety. His trusted accountant seconded the idea. It is believable that Werner was convinced the trusts were insufficient to protect his home from all kinds of potential liabilities, not just the guarantee to Harris, and that tenancy by the entirety was the only viable option.

Harris Bank also focused on the fact that the only actual liability Werner took on between the creation of the trusts in 2000 and the transfer into tenancy by the entirety in January 2003 was his guarantee liability to Harris Bank. If that was the only new liability, Harris argues, wouldn't that mean that Werner's decision to transfer the Real Property into tenancy by the entirety was motivated solely by a desire to avoid that new liability?

This is not a case, however, governed by <u>res ipsa loquitor</u>. Simply because the Harris guarantee was Werner's only new liability does not automatically lead to the conclusion that the transfer's only purpose was to avoid that new liability.

Werner testified that less than a year after he created the trusts, he learned about tenancy by the entirety. He had never discussed it before with Mommsen, the financial professional in whom he placed his trust. Indeed, when he raised the issue with Mommsen, the accountant had to do some investigating before telling Werner it was a good idea to hold his homestead in this form of ownership.

Furthermore, Werner testified about the potential liabilities he faced that could become real at any time. Werner operated a farming business as well as a book store. He

employed a manager in that store. He drove his farming equipment on public roads. He offered snowplowing services to the owner of his building as well as to family and friends. The court finds credible his testimony that he was concerned about these potential liabilities, obligations that would be his alone, and not held jointly with his wife.

Moreover, Werner testified about the other activities in his life during 2001 and 2002, activities that distracted him from accomplishing the transfer when he first considered it. Two daughters were married. His son left for college. He sold his remaining Shell station. Each of these events alone should not have distracted him, but combined with running an operating business as well as a farm, it is understandable that he did not act more quickly to effect the transfer of his home into tenancy by the entirety.

Finally, Werner believed that the collateral securing the debt to Harris was sufficient to pay off that debt. As he testified, "I had a net worth that was worth more than that net debt." At the time of the transfer, the storage facilities had not yet been sold at foreclosure, and Werner believed their sale would net sufficient proceeds to pay off the debt, that there would even be equity remaining after the sales. Although this testimony was undermined by Werner's apparent lack of interest in the sales – he did not attend and did not bid – it is corroborated by Zarlengo's testimony that the real property in Joliet was worth at least a million dollars.

With the benefit of hindsight, we know that Werner's belief in the value of the real estate and storage facilities owned by the LLCs was incorrect. But the court must consider Werner's state of mind at the time of the transfer, on January 23, 2003. He believed the debt to Harris Bank could be paid without resorting to a sale of the Real Property.

Werner decided to transfer the Real Property into tenancy by the entirety in late 2000. When his attorney was temporarily unavailable, Werner dropped the ball. He simply forgot about the transfer.

Why did he finally act in January 2003? Certainly the letters that Werner began receiving in the summer of 2002, advising him that the LLCs were missing loan payments, and the beginning of litigation that fall, forced him finally to take action. Werner's guarantee to Harris Bank and the increasing likelihood that it might be called upon were the impetus for finally tracking Friel down and transferring the Real Property.

But trying to avoid payment on the guarantee liability as the impetus for the transfer – as the final straw, the accelerating factor – is insufficient for Harris Bank to prevail. The statute instructs us that protecting the Real Property from liability on the guarantee to Harris Bank must have been Werner's sole intent when he accomplished the transfer. Harris Bank has not proved by a preponderance of the evidence that this is so.

## CONCLUSION

Having reviewed the testimony given at trial, the exhibits submitted into evidence and the papers filed by the parties, the court finds that Harris Bank has not proved by a preponderance of the evidence that the transfer of the Real Property into tenancy by the entirety left Werner unable to pay existing debts as they became due, and that Werner transferred the Real Property with the sole intent of avoiding payment of the guarantee. As a result, the transfer of the Real Property into tenancy by the entirety shall not be avoided. The court will enter judgment for the defendants.

Date: _APR - 8 2009_ 

_Pam Stroll_

PAMELA S. HOLLIS
United States Bankruptcy Judge